Ivan Warner, J.
Upon this hearing to determine the admissibility of certain statements made by the defendant, the credible evidence reveals the following:
On December 26, 1975, shortly before noon Lester Ferguson, video tape technician, Bronx District Attorney’s office, Frank Gemmati, then a hearing reporter, Bronx District Attorney’s office, and Assistant District Attorney, Nina Spiegler, arrived at the South Bronx Housing Police Precinct to video tape and stenographically record a statement of the defendant Leonard Woodson, who was under arrest for stabbing his wife to death.
When the video tape equipment was set up and the reporter and Assistant District Attorney were likewise ready to proceed, the defendant was brought into the room from the medication cell which was located nearby.
Prior to his being interviewed by the Assistant District Attorney, the defendant had been taken to Metropolitan Hospital where at 8 a.m., 75 millegrams of Vistorel, a painkiller, had been administered to him because he was then suffering from a loss of blood.
Assistant District Attorney Spiegler, commenced her questioning of the defendant at about 12:09 p.m., proceeding as follows:
Q. "Mr. Woodson, my name is Nina Spiegler and I am an *577 Assistant District Attorney in Bronx County. Do you understand what I am saying to you now?”
A. "Yes”
Q. "I understand you received some treatment at the hospital. Are you tired from that? Can you pay attention to whatever I say to you about this?”
A. "Go ahead.”
Q. "Before I speak to you about what happened, there are certain things which I want you to understand. One of those things is you have the right to remain silent. Do you understand that?”
A. "Yes”
Q. "Do you also understand that anything you might say jan be used against you?”
A. "Yes”
Q. "Do you understand that you have the right to have an attorney present and that if you can’t afford an attorney, that an attorney will be appointed for you. The court will get you an attorney. Do you understand that?”
A. "Yes”
Q. "Is there anything that you want to say to me?” Do you want to talk to me about what happened last night between yourself and your wife Shirley Woodson?”
A. "I don’t even know what happened.”
Q. "Do you want to talk to me?”
A. "I don’t know.”
Q. "Do you want to tell me what happened last night?”
A. "I don’t know.”
Q. "Why don’t you tell me what you think happened last night? What you can remember best.”
A. (Nods affirmatively,) "I don’t know what. I just walked out of the house.”
Q. "Do you remember doing anything before you walked out of the house.”
A. "No.”
Later on during the interview, the Assistant District Attorney asked the defendant:
Q. "How are you feeling now, Mr. Woodson?”, and he replied,
A. "Sleepy. Tired, Sleepy.”
*578 The first interview was concluded at about 12:17 p.m. The Assistant District Attorney described the defendant’s condition during this first interview as being in a stupor; looking tired; speaking inaudibly, appearing groggy, and taking a long time to answer.
The defendant was then escorted to a cell and Mr. Ferguson dismantled his video tape equipment in preparation to leave the precinct. Assistant District Attorney Spiegler and Mr. Gemmati were preparing to leave as well. However, some 2-3 minutes after the first interview, a housing police officer informed Ms. Spiegler that the defendant wished to make another statement.
What, if anything, occurred within this 2-3 minutes after the first interview is not known. Nevertheless, Ms. Spiegler and the housing authority police officer went to the defendant’s cell whereupon he told her that he wanted to speak with her. The transcript does not include any conversation between the defendant and the Assistant District Attorney during the interval between the first and second stenographically recorded interviews, a period of some nine minutes.
The defendant was escorted back into the room where he had been questioned originally, and a second interview was conducted by the Assistant District Attorney. The video tape equipment was not employed during this second session because it had been packed away and it would have required an undue delay if it had been reassembled.
However, the interview was stenographically recorded by Mr. Gemmati.
Ms. Spiegler commenced the second interview at about 12:26 p.m. as follows:
Q. "Mr. Woodson, I spoke to you a few minutes ago about what happened and you didn’t tell me much about what happened. Did you understand, when I told you, you had certain rights and that you didn’t have to talk unless you wanted to.” "Did you understand that?”
A. "Yes.”
Q. "Did you understand everything I said to you?”
A. "Yes.”
Q. "Are you feeling a little better now?”
A. "A little bit.”
No formal Miranda warnings were given to the defendant prior to taking his second statement. During the course of this *579 second interview he told Assistant District Attorney Spiegler that as he grappled with his wife for possession of a knife which she was holding, she sustained a stab wound to the chest. The interview was concluded at 12:32 p.m.
Aside from appearing somewhat more alert during the second interview, it appears that his over-all condition had not overwhelmingly changed.
CONCLUSIONS
A "heavy” burden of proof is always on the People to establish beyond a reasonable doubt that a defendant while the subject of in-custody interrogation, knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel before any statement made by the accused may be received into evidence against him. (Miranda v Arizona, 384 US 436, 475.)
This is based on the rule that the waiver of a constitutional right will not be lightly inferred. (Johnson v Zerbst, 304 US 458.)
A statement is involuntary when it is the product of threats, physical force, or obtained under circumstances inherently coercive.
This court, before permitting any statements made by this defendant to any law enforcement officer to be received into evidence against him, must be satisfied beyond a reasonable doubt that he was adequately warned, and understood the consequences of waiving his constitutional rights, and that his waiver was voluntary, knowing, and intelligent.
Also, evidence that the defendant was under sedation at the time he was questioned and in turn, made responses, may be considered on the question of voluntarily, knowingly, and intelligently waiving his constitutional rights.
Miranda warnings must be given in such a manner as to protect the individual’s freedom of choice to answer or to refrain from answering questions in situations which are inherently coercive.
Miranda warnings are intended to prevent the erosion of a suspect’s rights when that suspect is thrust into an unfamiliar and oppressive environment, isolated from outside aid.
Such warnings refer to "custodial interrogation” of suspects and defendants. This term is defined as the questioning of a suspect or an accused, initiated by the police "while the *580 defendant is in custody, or otherwise deprived of his freedom of action in any significant way.” (Ringel, Searches and Seizures, Arrests and Confessions [1972 ed], ch 4, § 43, citing Miranda v Arizona, 384 US 436, 444-445; People v Allen, 50 Misc 2d 897, revd 28 AD2d 724.)
At this hearing, the court was presented with the unique and novel opportunity to observe the defendant at the time the first statement was taken. This statement was video recorded at that time and televised in court.
This novel innovation afforded the court the opportunity not only to hear the voice of the defendant but also to observe his apparent physical and mental condition at the time he was being questioned by Assistant District Attorney, Spiegler.
As previously indicated, in conjunction with the video tape recording, the standard steno type machine and stenographer were employed.
In this way, the court not only had an audio-visual record of the interview, but a transcribed account of the questions asked and the answers given, all of which proved helpful in assisting the court, in arriving at a decision.
It should be noted at this juncture, that at various times while the video tape record was being projected in the courtroom, the court followed the proceedings by the use of the stenotype transcript. In more than one instance, the transcript, with regard to various questions and/or answers or parts thereof, varied with the account depicted on the video tape.
At various times during the viewing of the video tape, the court observed that the defendant mumbled inaudibly in response to questions posed by the Assistant District Attorney; however, for the most part, this is not reflected in the steno-type transcript. As noted, questions and/or answers or parts thereof appear on the video tape record but are not included in the transcript.
It would appear that the stenotype transcript is not a verbatum record of everything that was said by the Assistant District Attorney and/or the defendant, insofar as it pertains to the first interview.
The court is unable to make any comparison with regard to the second interview because the video tape equipment was not employed and so, the only available evidence is the stenotype transcript.
*581 The video tape recording that is available, however, provided the court with a first-hand graphic account of this defendant’s demeanor during the first interview.
It is the determination of this court, that based upon the totality of the circumstances and after considering all of the credible evidence adduced at this hearing, that the People have failed to fulfill their "heavy” burden of proving beyond a reasonable doubt that Leonard Woodson, while the subject of in-custody interrogation, voluntarily, knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel.
On December 26, 1975 at about 8 a.m. the defendant was present at Metropolitan Hospital and was given 75 milligrams of Visterol, a painkiller, to offset the effects of a loss of blood.
Some four hours later Assistant District Attorney Spiegler advised the defendant of his constitutional rights and thereafter took a statement from the defendant.
Prior to being interviewed by the Assistant District Attorney, this defendant was asleep in a medication cell inside the South Bronx Housing Police Precinct.
It is critical to the determination of the issue before this court that all of the witnesses called by the People and, who were present during this interview, described the defendant as looking tired, groggy, and taking a long time to answer questions posed to him. This testimony was confirmed by the video tape.
Frank Gemmati, then a hearing reporter for the Bronx District Attorney’s office, testified that he had difficulty in taking the minutes because the defendant spoke inaudibly from time to time.
Assistant District Attorney Spiegler characterized the defendant as being in a "stupor” at the time of the first interview.
Webster’s New Collegiate Dictionary (1973) defines "stupor” as follows: (1) a condition characterized by great diminution or suspension of sense or feeling; (2) a state of extreme apathy or torpor resulting often from stress or shock: daze.
This court acknowledges case-law holding that the fact that a defendant was under sedation at the time he made a confession does not of itself render the confession untrustworthy. (People v Moore, 23 NY2d 673; People v Schompert, 19 NY2d 300, cert den 389 US 874.)
*582 Instead, the court must review the totality of the circumstances and utilize all available evidence in arriving at a decision.
This court determines after having had the opportunity to view the video tape recording of the first interview and after considering all the credible evidence, that the defendant’s physical and mental condition was such that he could not and did not voluntarily, knowingly and intelligently waive his constitutional rights at the time he made the first statement.
A viewing of said video tape confirms the characterizations of the defendant’s physical and mental condition, as attributed to him by the People’s witnesses.
Some nine minutes after the conclusion of the first interview, Assistant District Attorney Spiegler took a second statement from the defendant.
This time only the stenotype machine was employed and there is no video tape recording of this interview.
No formal Miranda warnings were given to the defendant at the time.
While recognizing that there is no requirement to give Miranda warnings more than once (see, e.g., Gorman v United States, 380 F2d 158; Coyote v United States, 380 F2d 305; United States v Mansfield, 381 F2d 961), especially when, as in this case, there is only a nine-minute gap between the taking of the two statements, this court cannot overlook the fact that a sedative had been administered to the defendant some four hours earlier, and in addition, the court had the benefit of observing the defendant’s physical and mental condition as it existed during the first interview. The court notes that the testimony of the Assistant District Attorney was to the effect that the defendant was in a stupor during the first interview. Without the benefit of a video tape record of this second interview, and without any evidence as to what, if any, intervening variables occurred within that brief period of time between the two interviews which might have substantially affected the defendant’s ability to voluntarily, knowingly and intelligently waive his constitutional rights, this court cannot arbitrarily determine that the defendant’s physical and mental condition had changed substantially. In fact, there was testimony at this hearing to the effect that aside from appearing somewhat more alert during the second interview, the defendant’s over-all condition had not overwhelmingly *583 changed. Any doubts in this regard, must enure to the benefit of the accused.
This court further concludes that it was incumbent upon Assistant District Attorney Spiegler to fully advise the defendant of the four-prong Miranda warnings before she conducted the second interview. Nevertheless, this court concludes that even if full Miranda warnings had been given to the defendant prior to his making the second statement, this court would still find that based upon the totality of the credible evidence adduced at the hearing, the People have failed to prove beyond a reasonable doubt that the defendant voluntarily, knowingly and intelligently waived his Fifth Amendment and Sixth Amendment rights. The second statement must likewise be suppressed.
Therefore, the defendant’s motion to suppress both statements made to Assistant District Attorney Spiegler on December 26, 1975 is granted.